STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

SAILAJA M. PAIDIPATY (NYBN 5160007)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    sailaja.paidipaty@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> VICTOR VIERA-CHIRINOS, <br>    "Mojarra" <br><br> Defendant. | NO. 19-0367-02 CRB <br><br> **UNITED STATES' SENTENCING MEMORANDUM** <br><br> Judge: Hon. Charles R. Breyer <br> Sentencing Date: June 2, 2021 <br> Time: 1:30 P.m. |

## I. INTRODUCTION

For years Victor Viera-Chirinos profited from selling drugs in this District. He made enough money off the drug trade that when competition from other drug dealers increased, Victor[1] reminisced about the days when he could easily make $20,000 in a month. Victor maintained an organized network of street-level drug dealers who he supplied with drugs that were ultimately resold on the streets of San

---

[1] Because numerous co-defendants in this case have the same or similar last names, the government will refer to each individual by their first name to avoid confusion.

Francisco. As with any good businessman, Victor developed a reputation for having a good "product." Within the community, he was known to be a good "cook" – meaning he was known for his skill at adulterating narcotics, i.e. increasing the volume available for sale, while maintaining the quality of the drugs.

Over the course of many years, Victor adapted his trade and went to great lengths to avoid getting caught. He told a friend that he changed his phone number monthly to avoid being investigated. He told another that after being arrested a few times, he began using someone else's identification just to be safe. Despite his efforts, federal agents uncovered his criminal activities. But instead of being dissuaded from further criminal conduct, Victor used his federal arrest as an opportunity to learn, alter his practices, and continue selling drugs. Because of his underlying health conditions, Victor was granted temporary release from pretrial custody upon the outbreak of the COVID-19 pandemic. The terms of his release required him to remain on home confinement for 23 hours a day. Even with the stringent conditions imposed by the Court, Victor found a way to broker new drug deals - all while appearing to comply with his terms of release. He currently faces charges in San Mateo County for arranging a sale of counterfeit oxycodone laced with fentanyl. After learning of the charges, the government sought a bail hearing. At the hearing, the Court agreed that remand was appropriate, but considering Victor's health conditions allowed him to self-surrender following the completion of his second vaccine to protect against COVID-19. The same afternoon of the bail hearing, state officers executed a search warrant at Victor's apartment and seized a distribution quantity of suspected heroin.

To date, the Court has sentenced numerous individuals in this case, but no one with Victor's stature within the organization or years of criminal conduct. For too long, Victor has profited from the drug epidemic in the Bay Area and presumed that no consequences will follow. This Court should impose a lengthy custodial sentence in response to his unabated drug dealing. For the reasons explained below, the government will abide by the terms of the plea agreement in this case, despite the new conduct committed on pretrial release. The government, therefore, recommends a custodial sentence of 63 months and urges the Court to reject a motion for a downward variance based on the egregiousness of the conduct. In addition, the government seeks the imposition of a four-year term of supervised release

and a mandatory $100 special assessment.

## II. PROCEDURAL POSTURE

On August 8, 2019, a federal grand jury returned an Indictment charging Victor (and 13 co-defendants) with conspiracy to traffic drugs, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B). Dkt. 51. Following the outbreak of the COVID-19 pandemic, the Court granted temporary pretrial release based on the defendant's health factors. *See* Dkts, 238, 247. The initial 90-day release period has been extended on numerous occasions because of the ongoing public health situation. *See* Dkts. 289, 309, 337.

In April 2021, the government learned of state charges filed against Victor in San Mateo County based on alleged conduct that occurred while he was on pretrial release. *See* Dkt. 369. Based on the new information, the government sought a bond hearing. *Id.* On April 20, 2021, the Honorable Thomas S. Hixson, U.S. Magistrate Judge, ordered Victor remanded to custody, but stayed the order until May 28, 2021, at which point Victor would be fully vaccinated against COVID-19. *See* Dkt. 370-71.

## III. SENTENCING GUIDELINES CALCULATIONS

As set forth in the written plea agreement, the parties agree that the following Sentencing Guidelines apply:

a.  Base Offense Level, U.S.S.G. §§ 2D1.1(a)(5), (c)(5):                                      30
    (At least 1,000 KG but less than 3,000 KG of Converted Drug Weight)

b.  Acceptance of Responsibility (U.S.S.G. § 3E1.1(a):                                       - 3

Further, the government agrees that Victor qualifies for relief pursuant to the federal safety valve statute. While the Sentencing Guidelines have not been amended following the passage of the First Step Act, which changed the criminal history parameters for safety valve qualification, the government believes a two-level reduction in the offense level is appropriate. The final offense level based upon this calculation is 25, which at a Criminal History Category Level II results in an advisory Guidelines range of 63-78 months.

As noted above, evidence indicates that Victor committed numerous additional crimes on pretrial release. While these crimes may be a basis for the government to withdraw from the plea agreement, it

will not do so for two reasons. First, the conduct charged in San Mateo County occurred in October 2020, following the defendant's release on pretrial conditions, but before he entered into the plea agreement with the government. The plea agreement requires Victor to refrain from committing any further criminal offenses prior to sentencing. Because the San Mateo conduct predated entry of plea, Defendant may be able to argue that he is not in breach of the agreement. Second, with respect to the recent discovery of drugs in Victor's apartment, the government has yet to receive a full report of the conduct from the Alameda County Narcotics Task Force (the law enforcement agency investigating that case). The case remains under investigation and state charges have yet to be filed. The government, therefore, will abide by the bargain it stuck in the plea, including its sentencing recommendation.

## IV.   GOVERNMENT'S SENTENCING RECOMMENDATION

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin by calculating the correct sentencing range under the Sentencing Guidelines. *Id.* The Guidelines are "the 'starting point and the initial benchmark,'" *United States v. Ellis*, 641 F.3d 411, 415 (9th Cir. 2011) (quoting *United States v. Kimbrough*, 552 U.S. 85, 108 (2007)), and the Court should "remain cognizant of them throughout the sentencing process." *United States v. Gall*, 552 U.S. 38, 50 n.6 (2007). After determining the appropriate Guidelines calculations, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93. Here, the most important considerations are the nature and circumstances of the offense, the need to afford adequate deterrence, and the protection of the public. 18 U.S.C. § 3553(a)(1), (a)(2)(B)-(C).

### A.   Victor is a sophisticated drug dealer who operated in this District for years.

By now the Court is familiar with the basis for the current charges. The underlying wiretap investigation uncovered an organized drug network where Eduardo Viera-Chirinos, helped by his brother, Victor, and other family members, housed street-level dealers in houses and apartments in the East Bay. (*See* Dkt. 1, Compl. ¶¶ 59-139 (originally filed under 3:19-71145 TSH).) On a near daily basis, the organization provided street-level dealers with drugs. (*Id.*) The street-level dealers then

traveled to the Tenderloin where the drugs were resold.  (*Id.*)

What the Court has not seen until now is a member of the organization at the level occupied by Victor.  Victor is not a young street-level pawn in the drug trade, but rather is an experienced trafficker who through his own admission on recorded calls has been selling drugs in this District for years.  During an intercepted call on July 17, 2019, Victor told an individual named Diana that he initially started "out here" (the Bay Area) about "two years ago" and "business was very good."[2]  (*See* Declaration of Sailaja M. Paidipaty (Paidipaty Decl.), Ex. A, Line Sheets, Call 37.)  He said he was able to earn about $80,000 in the span of four to five months.  (*Id.*)  Since then, the market had become saturated.  Victor noted that "there were a lot of people from everywhere" and things had become more difficult.  (*Id.*)  Victor went on to state that when everyone else had gotten caught, he had not, but that caused people to think he was cooperating with law enforcement, which he was not.  (*Id.*)  Victor was likely referencing the 2018 investigation by the Richmond Police Department, which resulted in the seizure of kilos of drugs from an apartment rented by Eduardo and co-defendant Karen Castro-Torres (Presentence Report ("PSR") ¶¶ 26-27.)  After the discovery of those drugs, Eduardo and Karen fled to Seattle and left the day-to-day operations of the drug trafficking organization to other family members.  (*Id*. ¶ 27.)  Through his own admissions, then, Victor has been selling drugs in this District for years, even after other members of his family were facing law enforcement scrutiny for drug dealing.

Calls reveal that Victor's drug trafficking activity fit a pattern familiar to law enforcement; specifically, he received supplies of drugs from Los Angeles, a common midpoint for narcotics brought across the Southern border.  During another call with Diana, Victor discussed a shipment of drugs coming up from Los Angeles.  (*See* Paidipaty Decl., Ex. A, Line Sheets, Call 41.)  He told Diana that he had lent out his car so "they could go to Los Angeles."  (*Id.*)  He went on to say that there was "nothing available right now," but that "hopefully more would be sent on Friday from over there."  (*Id.*)  Victor said they send about "100 at a time" and he would let Diana know as soon as possible.  (*Id.*)  Based on

---

[2] The vast majority of intercepted phone calls were in Spanish.  Spanish linguists monitored the wiretap and prepared English summaries of the calls, which were produced to defense in addition to the original recordings.  The government's statements herein are based upon those English summaries, which have also been appended, in part, to the Declaration of Sailaja M. Paidipaty, filed concurrently with this briefing.

their training and experience, law enforcement report that a common way drugs enter this District is by way of couriers driving supplies of drugs up from Los Angeles. In one of the cases related to this prosecution, another defendant, Nicolas Soria, brought drugs from Southern California to one of the Viera family's competitors, Andy Reanos-Moreno. *See* Cr No 19-0381-17 CRB, Dkt. 299. This call suggests that Victor was expecting a significant load of drugs to be brought up from Sothern California within a matter of days. Finally, Victor believed the delivery person would arrive on Friday and that he would grab a little from him, but he did not want the risk of owning the entire thing. (*Id.*) In this last comment, Victor demonstrated his savviness as a trafficker. Often large quantities of drugs are purchased on consignment, a procedure commonly referred to as "fronting." A drug dealer who acquires a large supply and who gets caught by law enforcement, gets robbed, or simply cannot sell the amount, is still on the hook for the entire volume of narcotics. And as this Court knows, criminal penalties are tied to the volume of drugs that can be attributed to a dealer. Victor's comments show his sophistication in minimizing his risk.

Throughout his communications regarding drug dealing Victor repeatedly emphasized the measures he took to avoid getting caught. He told Diana that he changed his phone number every month to "minimize risks in case of investigations." (*Id.*). Like many drug dealers, Victor also maintained a personal phone and a "business" phone. He maintained one phone number that he used to talk to individuals such as his mother and daughters and he did not want to "talk about other things" on that phone. (*Id.*)

Victor's duplicity included helping family members lie to the police. In July 2019, officers in Washington stopped a truck that was driven by co-defendant Alexander Gonzalez with Eduardo riding as a passenger. Officers discovered kilos of drugs squirreled away in hidden compartment of the vehicle. (PSR ¶ 37.) The truck previously belonged to Victor's brother, Jorge. (*See* Paidipaty Decl., Exhibit A, Lines Sheets, Call 475.) Following execution of the Richmond search warrants in 2018, Jorge transferred the registration to Gonzalez's company, *see id.*, presumably to distance himself and his family from the car. After the seizure in July 2019, Victor called Jorge and warned him that the police may contact him regarding the truck because he was the prior owner. (*Id.*) Victor instructed Jorge to

tell the police that he sold the truck to Gonzalez's company because he "was broke." (*Id.*) While speaking with Jorge, Eduardo called one of Victor's other phone numbers. (*Id.*) Victor could be heard in the background assuring Eduardo that Jorge would go along with the plan and would tell the police that he had to sell the car for financial reasons. (*Id.*)

Remarkably, the seizure of kilos of drugs from Eduardo failed to dissuade Victor from continuing his drug sales. Three days after the car stop, and the same day he spoke with Jorge, Victor talked to another associate about further drug purchases. (*See* Paidipaty Decl., Ex. A, Line Sheets, Call 490.) Victor said he had one and a half ounces and had been trying to buy "white" "work." (*Id.*) Based on the investigation and their familiarity with coded language, agents believe Victor was buying cocaine, which is a white powder. Victor then said he was borrowing $20,000 from an individual in Honduras. (*Id.*) He said he was getting a lot of money because of the "up fronting" (i.e. buying drugs on consignment). (*Id.*) Victor again noted the increased competition in the business and said that his brother ("Chino") recently had been getting him "cooked ounces." (*Id.*) The increased scrutiny on his family did not cause Victor to think twice about continuing to sell drugs.

### B. Victor managed the housing network for the street-level dealers and "cooked" drugs sold by the organization.

As outlined above and in the PSR, Victor's role in the conspiracy included sourcing larger quantities of drugs, finding housing for street-level dealers, and "cooking" drugs. During an intercepted call on July 17, 2019, Victor told a man named Elio that one of his associates would help find Elio an apartment in Hayward. (PSR ¶ 20; Paidipaty Decl., Exhibit A, Lines Sheets, Call 17.) Victor said Hayward was the only place that had not "been burned," meaning under investigation by law enforcement. (*Id.*) During the same call, Victor said he had been "buying the product already cooked," but that he was going to "start cooking on Friday." (Paidipaty Decl., Exhibit A, Lines Sheets, Call 17.) In the context of drug trafficking, "cooking" typically references the process of converting powder cocaine into cocaine base (crack). It can also refer to the process of mixing pure drugs with another substance (such as lactose) in order to increase the volume available for a trafficker to sell. Sometimes this process of adulterating the drugs decreases the quality and produces a less potent effect. Victor,

7

however, was known as a "good cook" within the business. On a later call with another associate named Marlon, Victor bragged: "I was getting jobs that were cooked already but I'm cooking now. I started cooking last night and everybody prefers my work." (Paidipaty Decl., Exhibit A, Line Sheets, Call 377.) Throughout the investigation, Victor and other co-defendants referred to drug dealing and the drugs themselves as their "work." On another occasion, Victor told Elio that when people talked about who "had the good stuff" they would say "Mojarra," which is Victor's nickname. (Paidipaty Decl., Ex. A, Line Sheets, Call 132.) Victor prided himself on his "work" and relished his reputation in the community.

### C. After being granted compassionate temporary release upon the outbreak of the COVID-19 pandemic, Victor continued brokering drug sales.

In mid-April 2021, the government learned that the San Mateo District Attorney's Office filed charges against Victor for his role in facilitating a drug sale. According to investigative reports, in the fall of 2020, officers of the San Mateo County Narcotics Task Force received information from a confidential informant that an individual using the nickname "Tilapia" was selling oxycodone. (Paidipaty Decl., Exhibit C, Investigative Reports at 5.) Officers later identified "Tilapia" as Victor and an officer acting in an undercover capacity (UC) began reaching out to arrange a drug deal. During a recorded conversation, the UC said, "I need 5,000 blue pills…is this possible or is the job too big?" (*Id.*) Victor confirmed that it was possible and later in the conversation said the price would be "8." (*Id.*) Victor told the UC, "Just tell me where to send them and I'll send them to you." (*Id.*) The UC confirmed the order of "5,000 blue pills at 8 dollars" and said he/she would be in contact with Victor the following week. (*Id.*)

Four days later, the UC contacted Victor to follow-up. During that call, Victor asked if the UC used "Whatsapp," a mobile messaging application known for utilizing end-to-end encryption. (*Id.* at 6.) The UC said he/she did not use "Whatsapp" and asked if the following day worked for Victor. (*Id.*) Instead of specifically referring to the blue pills, Victor began speaking in coded language and noted that "the contract is ready and painted blue." (*Id.*) He went on to say, "that's why I like to use Whatsapp. This way is harder, but everything is good." (*Id.*)

The following day, Victor and the UC texted regarding a meeting location. (*Id.* at 7.) Victor said that he "sent [his] brother." (*Id.*) Victor told the UC which car the "brother" was driving and gave the UC the "brother's" nickname. (*Id.*) The UC met with the "brother," who was later identified as Willy Gomez-Britto. (*Id.* at 8.) Gomez-Britto sat in the driver's seat of a car with two other individuals, Joseph Grantcerrato and Carols Cerron. Grantcerrato lifted his shirt revealing a Ziploc bag containing several smaller baggies of blue pills. (*Id.*) Upon seeing the pills, officers arrested the three individuals and seized phones from them. (*Id.* at 9.)

Pursuant to search warrants, state officers searched the phones and located text messages from Victor to Gomez-Britto. (*See id*. 12-14.) Victor told Gomez-Britto the type of car that the UC was driving to the transaction and provided Gomez-Britto with the UC's phone numbers with instructions to call that number. (*Id.* at 13-14). Drug tests on the pills seized confirmed the presence of fentanyl. (*Id.* at 15.)

In January 2021, the San Mateo District Attorney's Office filed a criminal complaint and obtained a felony arrest warrant. However, based on current protocols put in place because of the COVID-19 pandemic, officers did not pro-actively attempt to arrest Victor and the parties were not aware of the filed charges until last month.

The government recognizes that the new case represents allegations rather than proven facts. However, a state judge found probable cause to issue an arrest warrant; a finding that this Court should credit. And while the provided reports are unclear regarding how officers identified the individual arranging the deal to be Victor, the recent conduct echoes the conduct to which he pled guilty, corroborating Victor's role in the fentanyl sale. For example, the individual corresponding with the UC went by the nickname, "Tilapia." During a call on July 23, 2019, Victor referred to himself as "Tilapia." Further, the October 2020 conduct reflects another hallmark of Victor's drug business, namely his caution conducting business over the phone. During the interactions with the UC, Victor suggested using the encrypted messaging service, WhatsApp. During the wiretaps, Victor told Eduardo (listed in the line sheets as "Rojo") that he had sent Eduardo a message on WhatsApp, but Eduardo had not checked it. (Paidipaty Decl., Ex. B, Line Sheets, Call 307)]

When the UC indicated that he/she did not use Whatsapp, Victor began using coded language to reference drugs. During the initial call on October 8, 2020, the UC referenced "5,000 blue pills" and Victor confirmed that a sale that large was possible; but in later calls he began alluding to the drugs as a construction project noting that "the contract is ready and painted blue." (*Id.*) After using this abstract language, he explained, "That's why I like to use Whatsapp" – meaning, he could be more open about the drugs being discussed if they were using a platform that could not be intercepted. Having learned from his prior experience, Victor attempted to better conceal his tracks this time around.

In addition to using the same habits as 2019, Victor also used the same drug courier – Willy Gomez-Britto. Agents intercepted numerous calls in 2019, during which Victor and other members of the Viera-Chirinos conspiracy spoke with or discussed Gomez. In one conversation, for example, Victor noted that "Willy" had a connection who could install "traps" or secret compartments in cars where drugs could be hidden. (Paidipaty Decl., Exhibit B, Call 58.) During another call, Victor told Eduardo ("Rojo") that another individual Rudulio (one of Victor's co-defendants) "sold one" – meaning one unit of drugs - to "Willy." (Paidipaty Decl., Exhibit B, Call 289.) Agents experienced with the underlying investigation believe Gomez acted as a street-level dealer and courier for the Viera-Chirinos organization. Gomez ultimately was not arrested and charged as part of the federal prosecution. His arrest in connection with the October 2020 deal, in addition to the information provided by the confidential informant and the similar patterns to 2019 indicate that Victor once more returned to drug dealing.

After learning of the state prosecution, government counsel moved for a bond hearing and Victor's remand into custody. The Honorable Thomas S. Hixson, U.S. Magistrate Judge, held a hearing on April 20, 2021, and agreed that the new criminal conduct merited remand. Considering Victor's health conditions, however, Judge Hixson stayed his order until May 28, 2021, at which point Victor would be fully vaccinated and required to self-surrender to Santa Rita Jail.

Later in the afternoon on April 20, 2021, government counsel learned that officers of the Alameda County Narcotics Task Force (ACNTF) executed a state search warrant at the apartment where Victor was living on release. Based on information relayed to federal agents, state officers seized

approximately one ounce of suspected heroin from the defendant's closet.  He was then arrested and transported to Santa Rita Jail where he bailed out later that evening.  The government again sought remand and Judge Hixson re-affirmed his prior order requiring Victor to self-surrender on May 28, 2021.  Over the course of the last month, government counsel has attempted to receive more information regarding the ACNTF investigation.  Counsel understands that reports of the investigation, including a report summarizing the contents of the defendant's phone are still pending.  At this time, no charges have been filed relating to the warrant execution.  The government, therefore, primarily notes this arrest for two reasons.  First, a state judge found probable cause to believe that drugs were in Victor's apartment and a distribution quantity of heroin was seized.  Second, these drugs were possessed on the very day that Victor appeared before Judge Hixson and pledged that he would abide by his terms of release.  The extent to which the defendant remains undeterred by a federal prosecution is remarkable.

The Court should give him no credit for his time on home confinement while on pretrial release.  That Victor was slyly able to comply with the terms of his location monitoring while brokering further drug deals shows his ability to get around any conditions imposed on him.  Upon learning of the San Mateo case, instead of seeking an arrest warrant, the government notified defense counsel and mutually agreed upon a date and time for a bond hearing.  That Victor would once more abuse the Court's trust and take advantage of the leniency he has been granted based on the pandemic by still possessing drugs is inexcusable.

### D. To avoid unwarranted sentencing disparities, Victor should be sentenced to a custodial term above 60 months.

Having presided over this case for over a year and a half now, this Court is familiar with the sentences received by Victor's co-defendants and defendants in the related cases.  To date the two highest sentences have been a five-year sentence imposed on Victor's nephew, Jorge Enrique Torres-Viera, and a three-year sentence imposed on Manuel Arteaga, a defendant in case number 19-0381 CRB. Victor's role was substantially more involved in the offense conduct and in drug trafficking overall than either Enrique or Arteaga.  Enrique helped manage the redistributor houses by collecting rent and cooked drugs like Victor.  But his role was still below that of Victor who was older within the family,

could source drugs (as illustrated by the conversation indicating that Victor was coordinating a drug shipment from Los Angeles), and had been selling drugs for years. Arteaga served as a "runner" for Andy Reanos-Moreno, the head of another drug trafficking organization operating in the Tenderloin. At Reanos-Moreno's direction, Arteaga delivered drugs on a near daily basis to the houses and apartments in Oakland where street-level dealers lived. In contrast, Victor was far more than a runner or middleman. His sentence should be higher than either Enrique or Arteaga's in recognition of his role in the conspiracy and to avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6).

* * *

Victor Viera-Chirinos operated at a high-level within his family's drug trafficking organization. His continued drug dealing in the face of law enforcement scrutiny and even after his arrest on federal charges demonstrates that a substantial sentence is necessary to deter future conduct and protect the public.

## V.   CONCLUSION

The government respectfully recommends that this Court impose a 63-month custodial sentence, followed by four years of supervised release, and a $100 mandatory special assessment.

DATED: May 26, 2021                                  Respectfully submitted,

STEPHANIE M. HINDS
Acting United States Attorney

          /s/
SAILAJA M. PAIDIPATY
Assistant United States Attorney